IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHARLES CRAIG REESE,                                        Case No. 3:14-cv-01394-SB

            Plaintiff,                                   **FINDINGS AND**
                                                           **RECOMMENDATION**

     v.

CAROLYN W. COLVIN,
Commissioner of Social Security,

            Defendant.

_____

**BECKERMAN, Magistrate Judge.**

      Charles Reese ("Reese") appeals the Commissioner of Social Security's ("Commissioner")

final decision denying his application for Social Security disability insurance benefits under Title II

of the Social Security Act, 42 U.S.C. §§ 401-434. The Court has jurisdiction to hear this appeal

pursuant to 42 U.S.C. § 405(g). For the reasons explained below, the Court recommends that the

district judge reverse and remand this case for further proceedings, because the Commissioner's

decision is not supported by substantial evidence.

Page 1 - FINDINGS AND RECOMMENDATION

## I. FACTS AND PROCEDURAL HISTORY

Reese was born on August 18, 1951, and he was fifty-seven years old on August 16, 2009, the alleged disability onset date. Reese stands five-feet, ten-inches tall and weighs approximately 240 pounds. After graduating from high school, Reese attended community college "for a couple years on and off." (Tr. 41.) From 1980 to 2008, Reese worked as an insurance claims representative and licensed agent, and, at one point, was the co-owner of an insurance agency. Reese stopped working completely in August 2009, after teaching online preparation courses on the insurance licensing examination for approximately fifteen months. (Tr. 220.) Reese protectively filed an application for disability insurance benefits on December 14, 2010, claiming he is unable to work due to hand tremors and chronic pain in his back, feet, and knees.

On April 7, 2010, roughly eight months post-alleged disability onset date, Reese was seen by Dr. Matt Upshaw ("Dr. Upshaw") at Roberts Street Clinic, P.C., in Gresham, Oregon.[1] Dr. Upshaw's treatment notes indicate that Reese's blood pressure was "good," that it had been a year since Reese's last examination, and that Reese reported "working out at the gym three to four times a week, bik[ing] for about a half hour, then us[ing] weights for about [twenty] minutes." (Tr. 259-60.)

---

[1] A doctor of osteopathic medicine, such as Dr. Upshaw, is an acceptable medical source under the Social Security regulations. *See Gonzales v. Colvin*, No. 13-1421, 2014 WL 4656470, at *3 n.3 (C.D. Cal. Sept. 17, 2014). "Osteopathy adheres to the principle that a patient's history of illness and physical trauma are written into the body's structure. Osteopathic physicians therefore complete additional training in the study of hands-on manual medicine and the body's musculoskeletal system to permit them to feel (palpitate) the patient's living anatomy (the flow of fluids, motion and texture of tissues, and structural makeup)." *Id.* (internal citation and quotation marks omitted).

Page 2 - FINDINGS AND RECOMMENDATION

On December 8, 2010, less than a week before Reese filed his application for disability insurance benefits, Reese visited the office of Dr. David Greenberg ("Dr. Greenberg"), "after nearly [six] years away from [his] care." (Tr. 265.) Reese complained about pain in both of his feet. Given "the lack of clarity to his diagnosis," coupled with Reese's "persistent symptoms" and "the usual difficulties in early diagnosis of inflammatory arthritis," Dr. Greenberg recommended that Reese undergo a rheumatology consultation with Dr. Kevin Khaw ("Dr. Khaw"). (Tr. 265.) Reese agreed and set up an appointment.

On January 3, 2011, Claudette Reese ("Mrs. Reese") completed a third-party adult function report, in support of her husband's application for disability insurance benefits. Mrs. Reese described her husband's typical day as consisting of eating, reading, watching television, stretching, checking the news on the Internet, and going to bed early due to chronic pain in his knee, foot, and back. In terms of functional limitations, Mrs. Reese stated that her husband's chronic pain interferes with his ability to lift, squat, bend at the waist, kneel, climb stairs, sit, stand, or walk for extended periods of time, sleep, get dressed, bathe, prepare meals, complete house and yard work, go outside, drive a car, shop, and travel. Mrs. Reese added that her husband uses a cane, but is still capable of shaving, caring for his hair, feeding himself, using the restroom, remembering to take his medications and attend to his personal needs, paying bills, counting change, handling a savings account, using a checkbook, reading, and using a telephone.[2]

When Reese visited rheumatologist Dr. Khaw on January 10, 2011, Reese reported that he had experienced constant, progressive pain in both feet over the course of the last eight years. Reese

---

[2] Reese also completed an adult function report on January 3, 2011. Reese's report largely reflects the same information as his wife's report.

denied pain in any other joints, reported that he "ha[d] no symptoms in the fingers or hands," rated his back pain as a three on a scale of ten and his foot pain a seven, and asked to "limit testing and costs" because he was "uninsured and unemployed." (Tr. 279.) The diagnostic impressions set forth in the report prepared by Dr. Khaw include hypertension, pain in both feet that is exacerbated by use, neuropathy, and metatarsophalangeal arthritis. Dr. Khaw also expressed some uncertainty regarding the etiology of Reese's chronic foot pain: "[Reese] lacks symptoms in other joints. In rheumatoid arthritis [situations], joints in the hands and fingers are typically involved, as one would expect after [Reese] has had symptoms for [eight] years." (Tr. 282.) Dr. Khaw therefore concluded that he would recommend a neurology consultation, because Reese showed signs of possible polyarthritis and spondyloarthritis.

On February 8, 2011, Reese presented for a neurology consultation with Dr. Vitalie Lupu ("Dr. Lupu"). Reese's chief complaint was "[n]umbness and pain in his extremities and shaking in his hands." (Tr. 273.) Based on his examination of Reese, Dr. Lupu concluded that Reese was suffering from chronic generalized peripheral neuropathy and a "mild" essential tremor. (Tr. 274.) Dr. Lupu also suspected that Reese was diabetic because "[h]is recent fasting glucose was 133 which is in the diabetes range." (Tr. 274.) Dr. Lupu was given the go-ahead to order a glucose tolerance test, but Reese asked Dr. Lupu to hold off on nerve conduction studies because he did not have insurance.

On February 14, 2011, Dr. Neal Berner ("Dr. Berner"), a non-examining state agency medical consultant, reviewed Reese's medical records. Dr. Berner concluded that Reese suffered from the severe medically determinable impairments of peripheral neuropathy, obesity, and disorders of the muscle, ligament, and fascia. In terms of postural and exertional limitations, Dr. Berner concluded

that Reese could lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk

up to two hours in an eight-hour workday, sit about six hours in an eight-hour workday, push and

pull in accordance with the lift and carry restrictions, occasionally climb ramps and stairs, never

climb ladders, ropes, or scaffolds, balance without limitation, and occasionally stoop, kneel, crouch,

and crawl. Dr. Berner concluded that Reese did not suffer from manipulative, visual, communicative,

or environmental limitations.

Reese presented for a follow-up visit with Dr. Upshaw on March 9, 2011. Dr. Upshaw's

treatment notes indicate that Reese had received abnormal results on his glucose tolerance test,

which prompted Dr. Upshaw to opine that there was "[l]ikely [a] new onset of diabetes." (Tr. 310.)

Dr. Upshaw did, however, note that Reese had been "trying to get some exercise," and that "an in

office hemoglobin A1 C [test] came back at 5.3 [percent] . . . [which] would represent a diet

controlled diabetic."[3] (Tr. 310.)

Reese presented for a follow-up visit with Dr. Upshaw on March 17, 2011. Dr. Upshaw's

treatment notes indicate that Reese had been admitted to the emergency room at Legacy Emanuel

Hospital on March 11, 2011. Reese told Dr. Upshaw that he had experienced bradycardia (a low

heart rate) and an "altered mental status," after consuming enough mixed drinks to reach a blood-

alcohol level of 0.357. (Tr. 309.) Dr. Upshaw discussed Reese's alcohol consumption, and noted that

---

[3] "[A]n A1 C or glycated hemoglobin test . . . provides a long term look at the patient's average blood sugar control for the past [two] to [three] months." *Cabello v. Grace*, No. 08–1334, 2011 WL 902340, at *4 n.6 (M.D. Pa. Mar. 15, 2011) (citation omitted). "The normal A1C level is 7% according to the American Diabetes Association and 6.5% according to the American Association of Clinical Endocrinologists. An A1C level of 10% translates to an estimated average glucose of 240. . . . Normal fasting blood glucose is 70–99 and normal blood glucose 2 hours after eating is 70–145." *Shedden v. Astrue*, No. 4:10–CV–2515, 2012 WL 760632, at *7 n.30 (M.D. Pa. Mar. 7, 2012) (citations omitted).

Page 5 - FINDINGS AND RECOMMENDATION

he was "worried that [Reese] may drink more than stated . . . [but he] gave him the benefit of the doubt." (Tr. 309.)

On April 21, 2011, Dr. Lupu completed a medical source statement, detailing his view of Reese's functional limitations.[4] Dr. Lupu opined that Reese could lift twenty pounds occasionally and fifteen pounds frequently, stand and walk up to four hours in an eight-hour workday, and sit up to eight hours in an eight-hour workday. Dr. Lupu also stated the following regarding the effects of Reese's pain and fatigue on his overall functionality: "Chronic neuropathic pain exacerbated by physical effort [and] stress." (Tr. 297.)

On May 16, 2011, Disability Determination Services referred Reese to Dr. Tatsuro Ogisu ("Dr. Ogisu") for a comprehensive neurology examination. Dr. Ogisu was asked to evaluate Reese's hand tremors and the chronic pain in his back, feet, and knees. Dr. Ogisu's recorded diagnostic impressions of peripheral neuropathy, an essential tremor, chronic lower back pain, a history of left knee problems, decreased cervical motion, and a "[l]eft fifth finger contracture." (Tr. 302.) Dr. Ogisu estimated that Reese was capable of sitting for up to six hours in an eight-hour workday, standing and walking "over short distances—up to half the time combined" during an eight-hour workday, lifting and carrying twenty pounds occasionally and ten pounds frequently, and handling items "up to frequently but very little for any activity which requires a steady hand." (Tr. 302.) Dr. Ogisu also noted that Reese's "[g]rip strength [wa]s full bilaterally," and he was "able to open and close a safety pin without any difficulty." (Tr. 301.)

_____

[4] A medical source statement is a "statement [from a medical source] about what [an individual] can still do despite [his] impairment(s)," considering medical history, clinical and laboratory findings, diagnosis, and treatment. 20 C.F.R. § 404.1513(b)(6).

On June 7, 2011, Dr. Richard Alley ("Dr. Alley"), a non-examining state agency medical consultant, reviewed Reese's medical records. Dr. Alley concluded that Reese suffered from the severe medically determinable impairments of peripheral neuropathy, obesity, and disorders of the muscle, ligament, and fascia. In terms of postural and exertional limitations, Dr. Alley concluded that Reese could lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk up to two hours in an eight-hour workday, sit about six hours in an eight-hour workday, push and pull in accordance with the lift and carry restrictions, occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, balance without limitation, and occasionally stoop, kneel, crouch, and crawl. Dr. Alley concluded that Reese did not suffer from manipulative, visual, communicative, or environmental limitations.

On December 29, 2011, Dr. Lupu completed a diabetes mellitus impairment questionnaire. Dr. Lupu indicated that he was of the view that Reese's prognosis was "painful diabetes neuropathy [that is] worsening." (Tr. 316.) Dr. Lupu noted that Reese evidences pain and weakness in his legs, mild ankle swelling, difficulty walking, back pain, fatigue, diarrhea, headaches, and "loss of balance due to neuropathy." (Tr. 317.) Reese's "primary symptoms," according to Dr. Lupu, are burning pain, numbness, tingling in his feet, a mild essential hand tremor, and back pain. (Tr. 317.) Dr. Lupu estimated that Reese would be absent from work two to three times a month, and could sit for one hour in an eight-hour workday, stand or walk for an hour or less during an eight-hour workday, and lift and carry twenty pounds occasionally and ten pounds frequently. Dr. Lupu also noted that Reese was not a malingerer, needed to avoid fumes and heights, could not kneel, bend, or stoop, and would frequently have difficulty maintaining his attention and concentration.

Page 7 - FINDINGS AND RECOMMENDATION

An administrative law judge ("ALJ") convened a video hearing on November 7, 2012, at which Reese testified about the physical limitations resulting from his impairments. (Tr. 35-75.) Reese testified that he did not believe he was capable of performing sedentary work, because he suffers from chronic pain and an essential tremor in his dominant hand. Reese stated that his chronic pain and left hand tremor negatively affect his ability to sit or stand for an extended period time, write legibly, use a keyboard and computer mouse, drive, pick up his grandson, bathe, trim his toenails, and shave. Reese added that he suffers from diabetes, high blood pressure, and gout, but only takes medication for the latter two conditions because his doctor wants him "to try and control [his diabetes] with diet and exercise." (Tr. 42.) Consistent with his doctor's recommendation, Reese testified that he avoids sugar and alcoholic beverages, and he drives to a health club a couple times a week to lift weights (e.g., upper body movements limited to fifteen pound dumbbells), and ride a recumbent bike for fifteen to twenty minutes. Although he claims a disability onset date of August 16, 2009, Reese acknowledged that he received unemployment benefits through the third quarter of 2011, and that he repeatedly represented to the state unemployment office that he was capable of working and had been applying for telemarketing positions. When asked whether he made the unemployment office aware of his functional limitations, Reese testified that he verbally informed officials that he would have difficulty operating a computer, and that he could not sit or stand for "very long." (Tr. 62.) Reese, however, could not recall whether he informed the unemployment office that he could only work on a part-time basis.

The ALJ and Reese's attorney posed a series of questions to a vocational expert ("VE") who testified at Reese's hearing. The ALJ first asked the VE whether Reese acquired any skills during his time as a insurance claims representative and licensed agent, that were transferable to a sedentary

level. The VE testified that Reese acquired the transferable skills of "advising clients, discussing various insurance policies, advantages and disadvantage[s] of insurance policies, and selecting specific insurance policies." (Tr. 67.) The VE further testified that the aforementioned skills were transferable to the sedentary occupation of a "placer" in the insurance industry, which requires, *inter alia*, the ability to "advise[] clients of independent agents in selecting casualty, life, or property insurance[.]" (Tr. 67.) The VE testified that there were 43,942 insurance placer jobs in the national economy, including 530 jobs in the regional economy of Oregon.

The ALJ next asked the VE to assume that a hypothetical worker of Reese's age and education could lift and carry twenty pounds occasionally and ten pounds frequently, "push and pull within light exertional limits," stand and walk for up to two hours in an eight-hour workday, "sit for about six hours in an eight-hour workday with normal breaks," and occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs. (Tr. 68-69.) The hypothetical worker, however, was precluded from climbing ladders, ropes or scaffolds, and needed to work in areas where fumes were not present. The VE testified that the hypothetical worker could be employed as an insurance placer or course instructor. Unlike the insurance placer job, the VE did not identify the number of available course instructor jobs in the regional and national economy. At the conclusion of the hearing, in response to questions posed by Reese's counsel, the VE testified that the insurance placer and claims representative position would require frequent handling (e.g., using a pen, pencil, or computer mouse) and occasional fingering (e.g., using a keyboard), and the course instructor and insurance agent positions would require frequent handling and fingering. (Tr. 71-72.)

In a written decision issued on December 27, 2012, the ALJ applied the five-step sequential process described in 20 C.F.R. § 404.1520(a)(4), and found that Reese was not disabled within the

meaning of the Social Security Act. *See infra* Part II.A-B. The Social Security Administration

Appeals Council denied Reese's petition for review, making the ALJ's decision the Commissioner's

final decision. Reese timely appealed to the federal district court.

## II. THE FIVE-STEP SEQUENTIAL PROCESS

### A.    Legal Standard

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which . . . has lasted

or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §

423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining

whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r*

*Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the
> claimant's impairment severe? (3) Does the impairment meet or equal [one of the
> listed impairments]? (4) Is the claimant able to perform any work that he or she has
> done in the past? and (5) Are there significant numbers of jobs in the national
> economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process.

*Bustamante v Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the

burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137,

140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the

Commissioner must show the claimant can perform other work that exists in significant numbers in

the national economy, "taking into consideration the claimant's residual functional capacity, age,

education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the

Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

**B.      The ALJ's Decision**

At the first step of the five-step sequential process, the ALJ found that Reese had not engaged in substantial gainful activity since August 16, 2009, the alleged disability onset date. At the second step, the ALJ found that Reese had the following severe medically determinable impairments: peripheral neuropathy, degenerative disc disease, diabetes mellitus, and obesity.

At the third step, the ALJ found that Reese's combination of impairments was not the equivalent of those on the Listing of Impairments. The ALJ then assessed Reese's residual functional capacity ("RFC") and found that he could lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for up to two hours in an eight-hour workday; sit for up to six hours in an eight-hour workday; occasionally climb ramps and stairs; occasionally stoop, kneel, crouch, and crawl; frequently handle and finger; and "lift, carry, push and pull within light exertional limits." (Tr. 22.) However, the ALJ found that Reese was not capable of climbing ladders, ropes, or scaffolds, and he can only "perform work in which fumes are not present according to the Dictionary of Occupational Titles." (Tr. 22.)

At the fourth step, the ALJ concluded that Reese was capable of performing past relevant work as an instructor, as the position did not require Reese to perform any work-related activities that were precluded by his RFC. Although the ALJ's step-four finding was sufficient to conclude that benefits should be denied, the ALJ proceeded to the fifth step and found, as an alternative reason to deny Reese's application for disability insurance benefits, that there were other jobs existing in significant numbers in the national economy that Reese could perform, such as work as an insurance

placer. Based on these findings, the ALJ concluded that Reese was not disabled within the meaning of the Social Security Act.

### III. STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions. *Id.* However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the ALJ's. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

### IV. DISCUSSION

In this appeal, Reese contends that the ALJ erred by: (1) rejecting the opinions of his treating and examining physicians, Drs. Lupu and Ogisu; (2) discrediting his subjective symptom testimony; (3) failing to develop a complete medical record regarding his chronic back pain; (4) failing to conclude that his essential tremor was a severe impairment at step two of the sequential process; (5)

concluding that he is capable of performing past relevant work at step four; and (6) concluding that he is capable of performing the position of an insurance placer at step five. As explained below, substantial evidence supports neither the ALJ's discrediting of Drs. Lupu and Ogisu's opinions nor the ALJ's rejection of Reese's testimony. By consequence, ALJ's RFC determination is not supported by substantial evidence. Accordingly, the Court recommends that the district judge reverse the Commissioner's decision. However, because the record creates serious doubt as to whether Reese was, in fact, disabled as of August 16, 2009, the Court further recommends that the district judge remand to the ALJ on an open record for further proceedings. The Court expresses no view as to the appropriate result on remand.

A.    **The ALJ Erred in Discrediting Drs. Lupu and Ogisu's Opinions**.

1.    **Applicable Law**

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (quoting *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

Specific, legitimate reasons for rejecting a physician's opinion may include its inconsistency with other medical evidence in the record, *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir.

2001);its inconsistency with the physician's own treatment notes, *Ghanim v. Colvin*, 763 F.3d 1154, 1161-62 (9th Cir. 2014); the fact that it is based to a large extent on a claimant's properly discredited subjective complaints, *Tonapetyan*, 242 F.3d at 1149; its inconsistency with a claimant's daily activities, *Clevenger v. Colvin*, 582 F. App'x 709, 710 (9th Cir. 2014); the fact that it is conclusory, brief, and unsupported by the record as a whole or by objective medical findings, *Tonapetyan*, 242 F.3d at 1149; its inconsistency with the claimant's subjective testimony, *Ranier v. Colvin*, No. 6:11–cv–06296–SI, 2013 WL 1809745, at *7 (D. Or. Apr. 29, 2013); the fact that the claimant's impairments can be effectively controlled with medication, *Rusten v. Comm'r of Soc. Sec. Admin.*, 468 F. App'x 717, 720 (9th Cir. 2012) (citing *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006)); and the claimant's failure to follow the physician's prescribed course of treatment, *Carillo v. Comm'r of Soc. Sec.*, No. 1:10–cv–01828, 2012 WL 3639117, at *7 (E.D. Cal. Aug. 23, 2012).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). But "[t]he ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* When "an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs." *Id.* (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)). "In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another

medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id*. at 1012-13 (citation omitted).

### 2.    Preliminary Considerations

Before reviewing the ALJ's treatment of Drs. Lupu and Ogisu's opinions, the Court will address two issues raised by the parties. The first issue is the Commissioner's reliance on *Turner v. Commissioner of Social Security*, 613 F.3d 1217 (9th Cir. 2010). In *Turner*, the claimant argued that the ALJ improperly rejected the findings of his treating physician. *Id*. at 1222. Disputed on appeal was whether a report generated by the treating physician was contradicted by a non-examining state agency medical consultant's hearing testimony. *See id.* at 1221-23. Proceeding on the assumption that the treating physician's report was uncontradicted, the Ninth Circuit concluded that the ALJ did not need to provide "clear and convincing reasons" for rejecting the report, because the ALJ did not reject any of the treating physician's conclusions, and instead incorporated his observations into the claimant's RFC.[5] *Id*. at 1223.

Citing *Turner's* discussion of the "clear and convincing reasons" standard, the Commissioner suggests that Reese's objection to the ALJ's handling of the medical evidence is without merit: "[Reese]'s objections to the ALJ's consideration of Dr. Lupu's and Dr. Ogisu's medical opinions about his functional capability are misplaced because, regardless of the ALJ's weighting of these opinions, [the] RFC finding was either consistent with, or more restrictive than, the functional limitations identified by these physicians." (Def.'s Br. at 9.) The Court disagrees. In certain respects, the RFC formulated by the ALJ was less restrictive than the functional limitations identified by Drs.

---

[5] As discussed above, the less stringent "specific and legitimate reasons" standard applies to contradicted opinions. *Traglio v. Colvin*, No. 3:12–CV–01349–JE, 2013 WL 3809549, at *6 (D. Or. July 22, 2013).

Lupu and Ogisu. For example, Dr. Lupu's December 2011 diabetes questionnaire (i.e., Dr. Lupu's most recent opinion regarding a patient whose painful diabetic neuropathy had worsened), indicates that Reese was capable of standing or walking for an hour or less during an eight-hour workday, yet the RFC states that Reese is capable of standing and walking for up to two hours in an eight-hour workday. Similarly, the RFC does not account for Dr. Ogisu's estimation that Reese was limited to something less than frequent handling: "[H]andling . . . up to frequent but very little for any activity which requires a steady hand." (Tr. 302.) The Commissioner implicitly acknowledges as much in her response brief, arguing that the ALJ reasonably discounted Dr. Ogisu's "steady hand" restriction. (Def.'s Br. at 10.) Based on these inconsistencies between the RFC and Drs. Lupu and Ogisu's opinions, the Court concludes that the Commissioner's reliance on *Turner* is unavailing, because the RFC was not consistent with, or more restrictive than, the functional limitations identified by these physicians.

The second issue is whether the ALJ was required to provide clear and convincing reasons, as opposed to specific and legitimate reasons, for discounting Drs. Lupu and Ogisu's opinions. In his opening brief, Reese correctly notes that the opinions of treating physicians and specialists are generally accorded more weight in Social Security cases. Reese then asserts that the ALJ failed to offer clear and convincing reasons for assigning "some weight" and "little weight" to Drs. Lupu and Ogisu's opinions. (Pl.'s Opening Br. at 19-20.) However, Reese recognizes that Drs. Lupu and Ogisu "[b]oth observed essential hand tremors which worsened with intention, greater in [his] left-dominant hand[,]" while the non-examining state agency medical consultants found that Reese "could frequently handle and finger." (Pl.'s Opening Br. at 18-19.) In other words, Reese acknowledges that the medical opinions conflict when it comes to the degree of limitations he

experiences in handling and fingering. When conflicting medical opinions exist, the ALJ need only provide specific, legitimate reasons for discrediting the opinion of the treating or examining physician. *Ryan*, 528 F.3d at 1198. The Court therefore rejects Reese's argument that the ALJ was required to provide clear and convincing reasons for discounting the opinions of Drs. Lupu and Ogisu. *See Larson v. Colvin*, No. 01:13–CV–00659–HZ, 2014 WL 1877406, at *10 (D. Or. May 7, 2014) (explaining how a non-examining physician's opinion suffices to establish a conflict among the medical opinions).

### 3.    Dr. Lupu

In her written decision, the ALJ limited her discussion of Dr. Lupu's testimony to the medical source statement he completed on April 21, 2011, and the diabetes questionnaire he completed on December 29, 2011. In the medical source statement, Dr. Lupu noted that Reese's functional restrictions began in 2003, and he opined that Reese could lift twenty pounds occasionally and fifteen pounds frequently, stand and walk up to four hours in an eight-hour workday, and sit for up to eight hours during an eight-hour workday. Dr. Lupu added that Reese suffers from "chronic neuropathic pain exacerbated by physical effort [and] stress." (Tr. 297.) In the diabetes questionnaire issued seven months later, Dr. Lupu stated that Reese's prognosis was "painful diabetes neuropathy [that is] worsening[,]" Reese suffers from type II, non-insulin dependent diabetes mellitus, and Reese's "primary symptoms" are burning pain, numbness, tingling in his feet, a mild essential hand tremor, and back pain. (Tr. 316-17.) Dr. Lupu estimated that Reese would be absent from work two to three times a month, and could sit for one hour in an eight-hour workday, stand or walk for an hour or less during an eight-hour workday, and lift and carry twenty pounds occasionally and ten pounds frequently. Dr. Lupu also noted that Reese was not a malingerer, needed to avoid fumes and

Page 17 - FINDINGS AND RECOMMENDATION

heights, could not kneel, bend, or stoop, and would frequently have difficulty maintaining his attention and concentration.

The ALJ assigned only "some weight" to the exertional limitations described in Dr. Lupu's medical source statement because "Dr. Lupu's treatment records demonstrate no objective evidence that the claimant's symptoms originated as early as 2003," and because Dr. Lupu's opinion "is not supported by additional evidence." (Tr. 25.) The ALJ added: "While the claimant alleges some foot pain to Dr. Greenberg originating in 2004, this was mechanical and not neuropathic. The claimant's blood sugars were not found to be elevated until 2011." (Tr. 25.) Next, the ALJ assigned "little weight" to Dr. Lupu's diabetes questionnaire because "[i]t is inconsistent with Dr. Lupu's objective findings of neuropathy only in the claimant's feet, and ignores the claimant's mechanical foot problems as at least partial etiology for his walking [and] standing issues." (Tr. 25-26.) The ALJ added: "At this point [i.e., December 2011], the claimant had not actually received a diagnosis of diabetes and he was not on any medications for diabetes. Dr. Lupu's opinion is inconsistent with his own medical findings as well as those of Dr. Ogisu and the claimant's primary care provider." (Tr. 26.)

Upon review, the Court concludes that the ALJ erred in assigning "some" and "little" weight to Dr. Lupu's opinion evidence. The Court will begin by addressing the ALJ's treatment of Dr. Lupu's April 2011 medical source statement. The ALJ's initial statement—that "Dr. Lupu's treatment records demonstrate no objective evidence that the claimant's symptoms originated as early as 2003"—is not a specific and legitimate reason for rejecting his opinion. Dr. Lupu did not start treating Reese until 2011, so it is evident why objective evidence from 2003 would be absent from Dr. Lupu's treatment records. Dr. Lupu was relying on Reese's self-report when he opined that

Reese's restrictions, such as walking and standing restrictions, began in 2003. (*See* Tr. 273, 297-98; *see also* Tr. 279.) Reese's self-report, which was first made to Dr. Lupu in February 2011, appears to be sufficiently consistent with the fact that Reese reported foot pain to Dr. Greenberg that originated in 2004. Putting that aside, however, it is irrelevant whether medical evidence exists demonstrating that Reese began experiencing neuropathic pain and associated restrictions in the early 2000s, because Reese does not allege disability until August 2009. *See Douglas v. Astrue*, No. 03:11–cv–00770–HU, 2012 WL 4485679, at *21 (D. Or. Aug. 28, 2012) (concluding that the ALJ's consideration of "medical evidence that significantly predate[d] [the claimant]'s alleged disability onset date was erroneous"); *McCray-Keller v. Colvin*, No. 2:12–cv–674–EFB, 2013 WL 5467201, at *7 (E.D. Cal. Sept. 30, 2013) ("Given that these records pertain to behavior well before plaintiff's alleged onset date, they are not probative evidence of plaintiff's functional impairments at the time she allegedly became disabled.").

The ALJ's second statement—that Dr. Lupu's opinions are not supported by additional evidence in the record—fails to satisfy the substantial evidence requirement. As discussed, "[a]n ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison*, 759 F.3d at 1012 (quoting *Reddick v. Chater*, 157 F.3d at 725). Here, the ALJ merely cited three exhibits (e.g., Exhibit 1F, Dr. Upshaw's September 2010 treatment records; Exhibit 2F, Dr. Greenberg's December 2010 treatment records; and Exhibit 4F, Dr. Lupu's February 2011 treatment records), without providing any further explanation, in support of her claim that Dr. Lupu's April 2011 medical source statement is not supported by additional evidence in the record. Without more, the Court cannot conclude that the ALJ met the Ninth Circuit's substantial evidence

standard, because the ALJ failed to elaborate sufficiently on this point. *Cf. Mkrtchyan v. Colvin*, No. 14-cv-1209, 2015 WL 2131222, at *9 (W.D. Wash. May 5, 2015) ("[T]he ALJ criticized Dr. Grinberg's opinions as being inconsistent with his examination findings and with the claimant's demonstrated abilities. The ALJ did not elaborate on these points; therefore, as an initial matter, the ALJ failed to meet the Ninth Circuit's substantial evidence standard.") (internal citation, quotation marks, and brackets omitted); *Binford v. Colvin*, No. 14-cv-1302, --- F. Supp. 3d --- , 2015 WL 3823319, at *2 (W.D. Wash. June 16, 2015) ("The ALJ stated that Dr. Scratchley's opinions were 'inconsistent with the medical evidence discussed above.' No more detail was provided. ALJs are not permitted to rely on this type of generic boilerplate critique—they must give specific reasons for rejecting a treating physician's medical opinion.") (internal citation omitted).

Even if that were not the case, however, none of the aforementioned exhibits address the topics that were the subject of Dr. Lupu's April 2011 medical source statement, such as the amount of lifting, walking, standing, and sitting Reese could be expected to perform in a normal eight-hour workday, or the expected duration of Reese's restrictions. As a result, the Court is left to speculate as to the basis of, or provide a *post hoc* rationalization for, the ALJ's statement that Dr. Lupu's April 2011 medical source statement is not supported by additional evidence in the record. *See Binford*, 2015 WL 3823319, at *2 ("Without identification of the specific evidence that contradicts Dr. Scratchley's opinions, a reviewing court is left to speculate about which evidence the ALJ had in mind when rejecting the opinions, and cannot evaluate whether or not the determination that the evidence conflicted with the opinions is a legitimate one."); *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) ("We are constrained to review the reasons the ALJ asserts."); *Orn v. Astrue*, 495

F.3d 625, 630 (9th Cir. 2007) ("We review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely.").

The ALJ also erred in her treatment of Dr. Lupu's diabetes questionnaire. As an initial matter, nothing in the record supports the ALJ's conclusion that Dr. Lupu ignored Reese's "mechanical foot problems as at least partial etiology for his walking and standing issues." (Tr. 25-26.) In fact, treatment records indicate that Dr. Lupu was aware of Reese's mechanical foot problems: "[Reese] was seen by [a] podiatrist [and] tried orthotics but the pain did not get better." (Tr. 273.) The Court also agrees with Reese that "[a]n inability to parse or assign a percentage of a given symptom to a given impairment is not a reason to reject a treating specialist's opinion about the functional limitations cumulatively caused by those symptoms." (Pl.'s Opening Br. at 19-20.)

Moreover, the ALJ's conclusion that Reese had not actually received a diagnosis of diabetes in December 2011, appears to be inaccurate. In a treatment record dated March 9, 2011, Dr. Upshaw documented the results of Reese's recent glucose tolerance tests, and Dr. Upshaw's assessment was a "[l]ikely new onset of diabetes." (Tr. 310.) Then, in a treatment record dated October 28, 2011, Dr. Upshaw stated that Reese has a history of type II diabetes, and his assessments refer unequivocally to "[d]iabetes." (Tr. 308.) Further, Dr. Lupu's diabetes questionnaire states that Reese suffers from type II, non-insulin dependent diabetes mellitus. (Tr. 316.) When asked to identify the laboratory and diagnostic test results that demonstrated and/or supported such a diagnosis, Dr. Lupu cited Reese's abnormal glucose tolerance tests, which were originally ordered by Dr. Lupu in February 2011. (Tr. 274, 317.)

Finally, the ALJ fails to explain adequately how Dr. Lupu's diabetes questionnaire is inconsistent with own medical findings. When Reese was first examined by Dr. Lupu in February

Page 21 - FINDINGS AND RECOMMENDATION

2011, Dr. Lupu concluded that Reese was suffering from a mild essential tremor and chronic generalized peripheral neuropathy. (Tr. 274.) Consistent with these findings, Dr. Lupu's diabetes questionnaire states that Reese suffers from a mild essential tremor, and that Reese's prognosis was "painful diabetic neuropathy," which was getting worse. (Tr. 316-17.) The Court cannot discern any meaningful inconsistency between Dr. Lupu's February 2011 treatment records, April 2011 medical source statement, and December 2011 diabetes questionnaire, in light of Dr. Lupu's opinion that Reese's condition was chronic and deteriorating. (*Compare* Tr. 273-74, *with* Tr. 297-98, *and* Tr. 316-21.)

In sum, the ALJ erred in her treatment of Dr. Lupu's opinion. Since the Court is unable to say that "it is clear from the record that the ALJ's errors were 'inconsequential to the ultimate nondisability determination,'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)), this case should be remanded to the Social Security Administration.

### 4.    Dr. Ogisu

Reese was seen by Dr. Ogisu for a comprehensive neurology examination on May 16, 2011. Dr. Ogisu's diagnostic impressions included peripheral neuropathy, an essential tremor, chronic lower back pain, a history of left knee problems, decreased cervical motion, and "[l]eft fifth finger contracture." (Tr. 302.) Dr. Ogisu estimated that Reese was capable of sitting for up to six hours in an eight-hour workday, standing and walking "over short distances—up to half the time combined" during an eight-hour workday, lifting and carrying twenty pounds occasionally and ten pounds frequently, and handling items "up to frequently but very little for any activity which requires a steady hand." (Tr. 302.)

The ALJ discredited Dr. Ogisu's sitting, lifting, and carrying restrictions (i.e., the ALJ only assigned these restrictions "some weight"), but failed to provide any reason for doing so. This was error. *See Gomez v. Colvin*, No. 13-cv-1273, 2014 WL 3339792, at *3 (D. Ariz. July 8, 2014) ("[T]he ALJ provided no reasons for rejecting portions of Dr. Prieve's opinion. This does not meet the standard required by the Ninth Circuit and constitutes legal error."). However, since the ALJ's RFC determination was consistent with Dr. Ogisu's sitting, lifting, and carrying restrictions, any error was rendered harmless. *See Chavez v. Astrue*, No. 10-cv-549, 2011 WL 3420848, at *2-3 (C.D. Cal. Aug. 4, 2011) (holding that ALJ's RFC determination was consistent with, and arguably more restrictive than, the less credited opinion and thus any error was harmless).

The ALJ also discredited Dr. Ogisu's fingering, walking, and standing restrictions, on the grounds that they were vague, inconsistent with the longitudinal record, and inconsistent with Reese's testimony indicating that his "tremor has not caused any long-term functional loss." (Tr. 25.) With respect to Dr. Ogisu's walking and standing restrictions, the ALJ added that Dr. Ogisu's opinion appeared to be based primarily on Reese's subjective statements, which the ALJ found to be not fully credible. (Tr. 25.)

The ALJ also erred in evaluating Dr. Ogisu's fingering, walking, and standing restrictions. First, it was error for the ALJ to conclude that Dr. Ogisu's walking and standing restriction appeared to be based on Reese's subjective complaints. Dr. Ogisu's opinion regarding Reese's ability to perform work-related activities differs from the limitations Reese reported to Dr. Ogisu, which, contrary to the ALJ's suggestion, indicates that Dr. Ogisu formulated his own opinion after examining Reese. (*Compare* Tr. 300, *with* Tr. 302.) For example, Dr. Ogisu opined that Reese could stand and walk for no more than four hours combined during an eight-hour workday, while Reese

reported to Dr. Ogisu that he could stand for fifteen to thirty minutes and walk between one and two blocks before needing to rest. Second, it was error for the ALJ to discredit Dr. Ogisu's opinion evidence by citing Reese's testimony that his tremor had not caused any long-term functional loss. During the hearing held on November 7, 2012, Reese testified that his tremor has caused long-term functional loss, such as an inability to write legibly, use a razor, and drink from a cup without spilling, as well as a more recent inability to operate a computer. (*See* Tr. 49, 55-57, 59-60, 62, 300.) Third, and finally, it was error for the ALJ to conclude that Dr. Ogisu's fingering, walking, and standing restrictions were inconsistent with the longitudinal record, without citing any specific evidence from the record. *See, e.g., Binford*, 2015 WL 3823319, at *2 ("The ALJ stated that Dr. Scratchley's opinions were 'inconsistent with the medical evidence discussed above.' No more detail was provided. ALJs are not permitted to rely on this type of generic boilerplate critique—they must give specific reasons for rejecting a treating physician's medical opinion.") (internal citation omitted); *see also Bray*, 554 F.3d at 1225 ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking.") (citations omitted).

In conclusion, the ALJ committed several errors in evaluating Dr. Ogisu's opinion evidence. Since the Court is unable to say that "it is clear from the record that the ALJ's errors were 'inconsequential to the ultimate nondisability determination,'" *Tommasetti*, 533 F.3d at 1038 (citation omitted), the Court recommends that the district judge remand this case to the Social Security Administration.

**B.    The ALJ Erred in Rejecting Reese's Symptom Testimony**.

**1.    Applicable Law**

In the Ninth Circuit, absent an express finding of malingering, an ALJ must provide specific,

clear, and convincing reasons for rejecting a claimant's testimony:

> Without affirmative evidence showing that the claimant is malingering, the [ALJ]'s
> reasons for rejecting the claimant's testimony must be clear and convincing. If an
> ALJ finds that a claimant's testimony relating to the intensity of his pain and other
> limitations is unreliable, the ALJ must make a credibility determination citing the
> reasons why the testimony is unpersuasive. The ALJ must specifically identify what
> testimony is credible and what testimony undermines the claimant's complaints.

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 (9th Cir. 1999) (citations omitted). Clear

and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting

medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the

claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the

alleged symptoms, and testimony from physicians and third parties about the nature, severity and

effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11–cv–583–SI, 2012 WL 2401642,

at *9 (D. Or. June 25, 2012); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) ("[T]he

ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would

be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" (quoting *Fair v.

Bowen*, 885 F.2d 597, 603 (9th Cir. 1989))).

In assessing a claimant's credibility, an ALJ may also consider (1) "ordinary techniques of

credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements

concerning the symptoms, and other testimony by the claimant that appears less than candid," and

(2) "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course

of treatment[.]" *Smolen*, 80 F.3d at 1284. If the ALJ's credibility finding is supported by substantial

evidence in the record, district courts may not engage in second-guessing. *Thomas*, 278 F.3d at 959

(citing *Morgan*, 169 F.3d at 600).

    **2.    Application of Law to Fact**

Here, the ALJ determined that Reese's "medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however, [Reese's] statements concerning

the intensity, persistence and limiting effects of these symptoms are not credible[.]" (Tr. 23.) The

ALJ provided several reasons for finding Reese's testimony not credible.

First, the ALJ rejected Reese's testimony because the ALJ concluded that Reese's diabetes

and neuropathy were not as debilitating as alleged:

> The record indicates that [Reese]'s diabetes is overall well-controlled with diet and
> exercise and Dr[s]. Lupu and Ogisu both [referred to Reese]'s neuropathy as limited.
> There is an element of metatarsalgia that accounts for [Reese]'s foot pain, as well as
> his poor gait; this appears to be more responsible for his foot pain than the
> neuropathy. [Reese] is not on any medications for diabetes or neuropathy. If either
> of these impairments were as serious as alleged, certainly one of his specialists or his
> primary care physician would prescribe the necessary medications. However, they
> have not.

(Tr. 24-25.) Contrary to the above-quoted statement, the record makes clear that Reese had been

prescribed Tramadol to alleviate the pain in his feet caused by peripheral neuropathy. (*See, e.g.,* Tr.

308.) In fact, on page twenty-four of her written decision, the ALJ noted that Reese was examined

by Dr. Ogisu on May 16, 2011, and Reese reported that his feet were numb and his "pain increase[d]

with weight bearing [but] improve[d] after getting off his feet and taking Tramadol." (Tr. 24.)

Furthermore, the ALJ concluded that an element of metatarsalgia appeared to be more responsible

for Reese's foot pain than neuropathy, even though no medical source reached that conclusion. *See*

Page 26 - FINDINGS AND RECOMMENDATION

*Kennedy v. Astrue*, No. 07-cv-236, 2008 WL 1808334, at *7 (D. Ariz. Apr. 21, 2008) ("The ALJ, however, is not a medical expert and should refrain from offering medical testimony." (citing, *inter alia*, *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975))). On the contrary, even Dr. Alley, a non-examining state agency medical consultant whose opinion was assigned significant weight and was found to be "most consistent" with the objective evidence, ranked Reese's peripheral neuropathy as the "[p]rimary" severe impairment contributing to Reese's functional limitations. (*See* Tr. 26, 97, 103, 105-06.)

Second, the ALJ rejected Reese's testimony based on an apparent conflict in Reese's testimony regarding his ability to use a computer:

> [Reese] said that he dictated answers to [the August 2012 insurance license] test questions to [his] wife and she maneuvered the mouse. I do not find this credible. [Reese] exhausted unemployment benefits through [the] third quarter [of] 2012. He made the claims on the computer each week. After realizing he had contradicted himself regarding his ability to use a computer, he then said he could use a computer back then, but then again corrected himself and said 'but not all the way through 2011.'

(Tr. 25.) The ALJ misconstrued the record. For example, Reese received unemployment benefits through the third quarter of 2011, not the third quarter of 2012, as the ALJ posited. (*See* Tr. 59, 189, 198.) During the hearing before the ALJ, Reese was forthcoming about the fact that he used a computer to apply for unemployment benefits, and was able to use a computer but "[n]ot through the end of 2011." (Tr. 62.) If Reese was no longer able to use a computer at the end of 2011, it was not inconsistent for Reese to claim that he needed his wife's assistance to renew his insurance license in August of 2012. The ALJ found otherwise because she believed incorrectly that Reese used a computer to apply for unemployment benefits through the third quarter of 2012. The record does not support the ALJ's conclusion.

Third, the ALJ rejected Reese's testimony because there was "some element of secondary gain present," in light of the fact that Reese's "unemployment benefits recently ended." (Tr. 25.) The ALJ added: "Although receipt of unemployment benefits does not preclude the receipt of Social Security disability benefits, it is one of many factors that must be considered in determining whether the claimant is disabled." (Tr. 25.) "Generally, in order to be eligible for disability benefits under the Social Security Act, the person must be unable to sustain full-time work-eight hours per day, five days per week." *Mulanax v. Comm'r of Soc. Sec.*, 293 F. App'x 522, 523 (9th Cir. 2008). Under Oregon law, however, "a person is eligible for unemployment benefits if she is available for some work, including temporary or part time opportunities." *Id*. (citing OR. ADMIN. R. 471-030-0036(2)(b), (3)(b)). Thus, Reese's "claim of unemployment [benefit]s in Oregon is not necessarily inconsistent with h[is] claim of disability benefits under the Social Security Act." *Id*. In any event, the record here does not establish whether Reese held himself out as available for full-time or part-time work. (*See* Tr. 63, 189, 198.) Because only the former is inconsistent with Reese's disability allegations, and because it appears as though Reese may have, at a minimum, held himself out as available only for part-time work during the third quarter of 2011 (i.e., Reese received less than fifty percent of the amount paid out during the preceding months), the stated basis for the ALJ's credibility finding is not supported by substantial evidence. *See Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) ("[T]he record here does not establish whether Carmickle held himself out as available for full-time or part-time work. Only the former is inconsistent with his disability allegations. Thus, such basis for the ALJ's credibility finding is not supported by substantial evidence.").

In light of the foregoing, the Court concludes that the ALJ's adverse credibility finding is not supported by substantial evidence.

**C.     The ALJ's Duty to Develop the Record Further was not Triggered**

Reese also argues that the ALJ failed to develop a complete medical record regarding his chronic back pain. The Court disagrees.

"In Social Security cases, the ALJ has a special duty to develop the record fully and fairly and to ensure that the claimant's interests are considered, even when the claimant is represented by counsel." *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001) (citing *Tonapetyan*, 242 F.3d at 1150, and *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)). "The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." *Tonapetyan*, 242 F.3d at 1150. However, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes*, 276 F.3d at 459-60 (citing *Tonapetyan*, 242 F.3d at 1150).

In this case, the ALJ's duty to develop the record further was not triggered because the record is neither ambiguous nor inadequate to allow for proper evaluation, with regard to Reese's back pain. Dr. Ogisu did note that Reese's past "X-rays reportedly showed some bulging discs," and the ALJ observed that "these X-rays d[id] not exist in the record." (Tr. 24, 300.) Nevertheless, after conducting a comprehensive examination of Reese, Dr. Ogisu provided an opinion that was neither ambiguous nor inadequate to allow for proper evaluation with regard to Reese's chronic pain back: "Chronic back pain. This is not very prominent during the exam, but occasional positional and

Page 29 - FINDINGS AND RECOMMENDATION

mechanical pain is present." (Tr. 302.) Accordingly, the Court rejects Reese's argument that the ALJ

failed adequately to develop the record.[6]

### D.    Remand for Further Proceedings is Appropriate

In light of the Court's determination that the ALJ erred, and because this case ultimately turns

on whether the Court should credit the improperly discredited evidence as true (*compare* Pl.'s Br.

at 26, *with* Pl.s' Br. at 13-17), the Court proceeds to address the proper remedy. Three requirements

must be met before the Court may remand a case to the ALJ with instructions to award benefits:

> (1) the record has been fully developed and further administrative proceedings would
> serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons
> for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the
> improperly discredited evidence were credited as true, the ALJ would be required to
> find the claimant disabled on remand.

*Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014) (citation omitted). Even if these requirements

are met, however, the Court "retain[s] 'flexibility' in determining the appropriate remedy." *Id*. In

particular, the Court "may remand on an open record for further proceedings 'when the record as a

whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the

Social Security Act.'" *Id.*

In this case, as in *Burrell*, the Court "need not determine whether the three preliminary

requirements are met because, even assuming that they are, [the Court] conclude[s] that the record

as a whole creates serious doubt as to whether [Reese] is, in fact, disabled." *Id*. Reese's principal

arguments on appeal are: (1) based on his essential tremor, he lacks "the RFC to perform the

handling and/or fingering requirements of all the jobs identified by the VE at Steps 4 and 5," and (2)

---

[6] During the hearing, the ALJ also asked Reese's counsel if "[a]nything else need[ed] to come
in to complete the record," and Reese's counsel replied, "No. Everything is in that we've submitted
and that we received." (Tr. 36.)

Dr. Lupu opined that Reese could only sit for up to an hour in an eight-hour workday, which "would [also] eliminate the jobs identified by the VE at Steps 4 and 5." (Pl.'s Opening Br. at 26.) Importantly, however, Dr. Ogisu's examination report suggests that Reese's hand tremor could be treated with a beta blocker: "Essential tremor. This is mild at rest but is observed to increase significantly in the hands with intention. Apparently, he has not tried treatment with a beta blocker." (Tr. 302.) Furthermore, Reese's hearing testimony regarding his ability to drive to his local health club in order to ride the recumbent bike and lift dumbbells appears to contradict Dr. Lupu's opinion regarding the degree of Reese's functional limitations. Finally, although the record is not entirely clear on the point, the fact that Reese may have held himself out as available for full-time work up until the third quarter of 2011, in order to receive unemployment benefits, creates serious doubt as to whether Reese was, in fact, disabled as of August 16, 2009. Accordingly, the Court recommends that the district judge remand to the ALJ on an open record for further proceedings. *Cf. Burrell*, 775 F.3d at 1142 (holding that substantial evidence supported neither the ALJ's adverse credibility determination nor the ALJ's rejection of the treating physician's opinion, but nevertheless remanding to the ALJ on an open record for further proceedings, because the record created serious doubt as to whether the claimant was, in fact, disabled).

## V. CONCLUSION

For the foregoing reasons, the Court recommends that the district judge reverse and remand this case for further proceedings.

## VI. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed,

the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 29th day of September, 2015.

_____
STACIE F. BECKERMAN
United States Magistrate Judge